**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00140-CR**
_____

**RICARDO VILLARREAL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 21-10-13992-CR**

**MEMORANDUM OPINION**

A Montgomery County Grand Jury indicted Ricardo Villarreal for the offense of continuous sexual abuse of a child under the age of fourteen, a first-degree felony.[1] *See* Tex. Penal Code Ann. § 21.02(b)(2)(A). After a trial, a jury convicted him. The trial court assessed punishment and sentenced Villarreal to sixty years of

---

[1]Appellant's name is spelled inconsistently throughout the record. In some places, he is referred to as "Villarreal," and in others, "Villarrael" or "Villarael." We use the spelling in the indictment and trial court's judgment.

1

confinement. In a single issue, Villarreal challenges the trial court's judgment and asks whether the trial court erred when it allowed the State's expert to testify over Villarreal's objection. We hold the trial court did not abuse its discretion in admitting testimony from the State's expert witness. We affirm the trial court's judgment as discussed below.

## BACKGROUND

### Trial Evidence

Villarreal was accused of continuously sexually abusing his stepdaughter, "Sara," a child younger than fourteen.[2] Evidence presented at trial revealed that the abuse began when Sara was six years old and continued off and on for nine years. Sara testified the abuse started with Villarreal inappropriately touching her vagina and escalated to Villarreal touching her vagina with his penis and trying to "put it in."

According to Mother, Sara first outcried when she was six years old, but she recanted the same day. There was evidence she outcried again when she was fifteen or sixteen. Sara attributed her delayed outcry to Villarreal threatening her family, among other things.

---

[2]We use pseudonyms to refer to the alleged victim, a minor child, and the child's family members. *See* Tex. Const. art. 1, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal judicial process").

There was evidence that Villarreal engaged in grooming behaviors. Mother testified at trial that Villarreal spent more time with Sara than the other children in the home and bought her gifts, which was consistent with the investigating detective's testimony of what Villarreal reported during his interview with her. According to Karen Rosario, a detective in the case, Villarreal described Sara as his "sidekick." Rosario felt that Villarreal was grooming Sara.

The forensic interviewer, Kelly Garcia, said she interviewed Sara twice when Sara was fifteen. She described Sara's withdrawn demeanor and crying. She also explained that they ended the first interview due to Sara's mental health. Garcia described types of disclosures, including denial, active disclosure, tentative, recant, and reaffirmation. She noted that the barriers to disclosure for Sara included fear and embarrassment. Garcia testified that delayed outcries are common and explained the reasons for that.

Sara testified that because of the abuse, she changed her appearance, she attempted suicide many times by taking pills, struggled with anxiety, and began cutting herself. When she was sixteen, Sara outcried again when her sister asked about it. After her first forensic interview, the evidence showed that Sara was hospitalized on an inpatient basis for suicidal ideation. The defense's trial strategy was to characterize Sara as "a troubled child" who made up the allegations and said nothing for ten years.

Villarreal testified at trial and denied the allegations. According to Villarreal, Sara was lazy, and he was the bad guy to make her clean and go to school. He admitted to being mentally abusive to his children and stepchildren "at times." Villarreal testified that he never touched Sara inappropriately for purposes of sexual arousal, and if he ever touched her inappropriately it was "by accident[]" while wrestling. He claimed Sara made up the sexual assault allegations, because she was mad that he took everything away from her.

**Rule 702 Hearing and Expert Testimony**

The State offered testimony from Dr. Danielle Madera, a clinical psychologist, to explain sexual abuse dynamics. The State's expert designation of Madera stated that her "[a]reas of expertise include child psychology, trauma, behavior surrounding disclosure of sexual and/or physical abuse, psychological and sociological effects of child sexual and/or physical abuse, delayed disclosure of sexual and/or physical abuse, process of disclosure, pedophilia, behaviors of abusers and victims."

The trial court conducted a Rule 702 hearing, and Madera described her education, training, and credentials. She is a clinical psychologist. Her experience includes providing "individual, group, family therapy, psychological evaluations, and extended forensic evaluations to younger children, where there were allegations

4

of child sexual abuse." She relayed that she has testified as an expert approximately fifty times in other court cases.

To prepare for her testimony, Madera said she read the incident report but did not listen to any testimony presented or know what evidence was introduced in the case. She explained that her role was "to provide information related to my experience, as well as the literature, for the jury to use as they see fit in this case[,]" rather than provide testimony that would help prove one of the facts at issue in the case. Madera said, "I'm going to offer information to help the jury understand the dynamics of child sexual abuse, from my experience and the literature[,]" but would not offer anything on guilt or innocence.

At the end of the hearing, Villarreal's attorney objected that the knowledge Madera would offer "is not relevant to help the jury determine the final fact issue in question[,]" which he characterized as whether specific sex acts happened and how many times. He argued that Madera was "merely bolstering . . . the State's theory of the case." The State responded that Madera's testimony was relevant, although she was not there to establish whether the crime happened. Instead, the State contended that Madera would help the jury understand the evidence, especially where the defense raised issues with Sara's behavior and being inconsistent. The trial court ruled that Madera was qualified as an expert under Rule 702, and her "specialized knowledge will help the trier of fact to understand the evidence."

When Madera testified for the jury, she again described her qualifications, education, training, and experience with child sexual abuse cases. She explained that her purpose in testifying was "[t]o help the jury understand the dynamics of child sexual abuse" from her "experience, as well as the literature, to use as you guys see fit in this case." Madera said she reviewed the incident report to prepare for her testimony.

Madera explained what grooming was and that perpetrators use it to lower a child's inhibitions to abuse the child later sexually. She said that some common examples of grooming included tickling, wrestling, or having their hands on a child to lower their boundaries, special privileges, attention, and gifts. She noted that it was common for children to know their abuser.

Madera discussed disclosures and told the jury that often, these cases involve a delayed disclosure. She explained that sometimes children will provide partial disclosures, meaning they do not relay every detail in their first interview, because it involves "complex trauma" where they are "abused over years[.]" Madera testified that a child cannot remember every detail over the course of years, but there will be certain things that stick out, like the first or last time, or a time that was particularly painful, different things will stand out, and "in time, the events will blend" when it happens consistently. She provided an example of this type of recall and relaying different details of a vacation trip to different individuals, there would be different

6

facts that one would tell their best friend versus their mother, but it does not make it less truthful. Madera described sensory details that children recall.

Madera also testified about the concepts of outcrying and recanting. She explained that often, children provide a partial disclosure and are "testing the water" to see if their caregiver will believe them. If the caregiver's response is not what the child expects or is not supportive, "or for a multitude of reasons," the child may pull back and say "just kidding[]" because they are not ready to deal with the ramifications of the disclosure. Madera outlined why a child may not remember a recantation, including the time that passed or that a parent was very dismissive. She noted that parents' responses vary, and unfortunately, many do not believe the abuse is happening, which can go back to grooming both the parent and the child that allows the perpetrator to discredit the child.

Madera described the different emotional responses of children to the trauma, including depression, anxiety, difficulty with interpersonal relationships, and sexualized behavior. She acknowledged those could also be symptoms of bipolar disorder, as could suicidal thoughts and that child sexual abuse can play into later mental health diagnoses. She testified that sometimes children will not disclose, because the perpetrator has threatened them. Madera noted that sometimes a caregiver will know, but because of psychological reasons, like the caregiver's

7

dependence on the perpetrator, they "seem to have a blind eye … or just completely deny it."

After Madera testified, the defense moved for a mistrial. Among other things, the defense argued that she provided no evidence that would help the jury determine any element in the case. The trial court denied the motion for mistrial, reasoning that based on the 702 hearing, Madera met the qualifications as an expert and testified to matters that "would assist the trier of fact in understanding the evidence."

## ISSUE

In a single issue, Villarreal asks whether the trial court erred when it allowed the State's expert, clinical psychologist Dr. Danielle Madera, to testify over his objection. In support of this issue, Villarreal contends the State failed to establish the reliability and relevance of Madera's testimony. Villarreal argues that Madera only reviewed the incident report and could not identify the evidence she was supposed to help the jury understand.

## STANDARD OF REVIEW AND APPLICABLE LAW

We review a trial judge's ruling on the admissibility of expert testimony for an abuse of discretion. *See Wolfe v. State*, 509 S.W.3d 325, 335 (Tex. Crim. App. 2017). We will not disturb the trial court's ruling if it is within the zone of reasonable disagreement. *See id.* Texas Rule of Evidence 702 governs the admissibility of expert testimony and provides that

8

[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

Tex. R. Evid. 702. A trial court must make

three separate inquiries, which must all be met before admitting expert testimony: "(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case."

*Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006) (quoting *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006)). "These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance." *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). The reliability inquiry is flexible. *Vela*, 209 S.W.3d at 134. "In some cases, the reliability of scientific knowledge will be at issue; in others, 'the relevant reliability concerns may focus upon personal knowledge or experience.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). That said, a proponent must establish some foundation for the reliability of an expert's opinion. *Id.* "'Experience alone may provide a sufficient basis for an expert's testimony in some cases, but it cannot do so in every case.'" *Id.* (quoting *Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 726 (Tex. 1998)).

Sister courts have previously concluded and explained that expert testimony regarding the effect of sexual abuse on children is nonscientific expert testimony. *See Mulvihill v. State*, 177 S.W.3d 409, 413 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *see also Bisbee v. State*, No. 14-22-00164-CR, 2023 WL 5622828, at *2 (Tex. App.—Houston [14th Dist.] Aug. 31, 2023, pet. ref'd) (mem. op., not designated for publication). Likewise, the Court of Criminal Appeals has held that expert psychological testimony about characteristics commonly displayed by child victims of sexual abuse is admissible. *See Cohn v. State*, 849 S.W.2d 817, 817–19 (Tex. Crim. App. 1993) (concluding testimony was relevant and rejecting argument that testimony should be excluded based on bolstering objection). Psychology is typically considered a "soft science." *See Weatherred v. State*, 15 S.W.3d 540, 542 n.5 (Tex. Crim. App. 2000) (explaining that psychology is generally included as a "soft" science); *Reynolds v. State*, 227 S.W.3d 355, 371 (Tex. App.—Texarkana 2007, pet. ref'd) (same). The reliability of "soft" science evidence can be established by showing that: (1) the field of expertise involved is a legitimate one; (2) the subject matter of the expert's testimony is within the scope of that field; and (3) the expert's testimony properly relies upon or utilizes the principles involved in that field. *Weatherred*, 15 S.W.3d at 542 (citation omitted). Further, the Court of Criminal Appeals has determined that expert testimony regarding the grooming of children for sexual abuse and behavioral characteristics of sexually abused children

is appropriate. *See Morris v. State*, 361 S.W.3d 649, 667–68 (Tex. Crim. App. 2011) (explaining that expert testimony regarding grooming behavior was useful to the jury and still involves matters beyond the understanding of the jury); *Cohn*, 849 S.W.2d at 819 (explaining such evidence was relevant and admissible, rejecting bolstering complaint).

## ANALYSIS

At the 702 hearing, Madera explained in detail her education, training, and over twenty years of experience dealing with child sex abuse victims. She testified that she had a Ph.D. in clinical psychology. She did not sit through the trial, and her only preparation was reviewing the incident report, and she explained that she would not address whether Villarreal was guilty. Based on that, Villarreal contends her testimony was not reliable or relevant. We disagree.

Madera explained her qualifications, which Villarreal agrees on appeal, show her knowledge in the field of clinical psychology. She described her years of practicing clinical psychology and providing clinical therapy to children, including reviewing literature. *See Weatherred*, 15 S.W.3d at 542. As a practitioner of psychology, Madera's testimony regarding her extensive experience and review of the literature was consistent with meeting the three necessary considerations for the reliability of a "soft science." *See id.*; *Reynolds*, 227 S.W.3d at 371 (addressing psychology as a "soft science").

11

The evidence showed that Villarreal engaged in behaviors consistent with grooming. The evidence also established that Sara had a delayed outcry, recanted an earlier outcry, and suffered from multiple mental health and behavioral issues, all of which the defense focused on at trial. Madera explained for the jury the dynamics of grooming, provided examples of these behaviors and how perpetrators use these behaviors to lower a victim's defenses. Madera also described mental health issues child sex abuse victims may experience, including depression and anxiety, but she agreed that such things could stem from bipolar disorder, which was something Sara suffered from. Finally, Madera discussed disclosures, delayed outcries and provided reasons for why a child might recant an outcry. As outlined above, courts have considered expert testimony on grooming behaviors and behavioral characteristics of sexually abused children as appropriate, explaining that such testimony is relevant and useful for the jury in understanding the evidence. *See Morris*, 361 S.W.3d at 667–68; *Cohn*, 849 S.W.2d at 819.

Here, the trial court could have reasonably determined that Madera's testimony based on her specialized knowledge in clinical psychology, child sex abuse dynamics, including grooming behaviors, mental health issues seen in child sex abuse victims, disclosures, and recantation would help the jury understand the evidence. *See* Tex. R. Evid. 702; *Weatherred*, 15 S.W.3d at 542; *see also Morris*, 361 S.W.3d at 667–68; *Cohn*, 849 S.W.2d at 819. Since the decision to admit

12

Madera's expert testimony under Rule 702 was within the zone of reasonable disagreement, we hold the trial court did not abuse its discretion. *See Wolfe*, 509 S.W.3d at 335. We overrule Villarreal's sole issue.

## CONCLUSION

Having overruled Villarreal's sole issue, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on January 26, 2026
Opinion Delivered April 1, 2026
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.